BROWNE GEORGE ROSS
O'BRIEN ANNAGUEY & ELLIS LLP
Eric M. George (State Bar No. 166403)
  egeorge@bgrfirm.com
Maribeth Annaguey (State Bar No. 228431)
  mannaguey@bgrfirm.com
Carl Alan Roth (State Bar No. 151517)
  croth@bgrfirm.com
James L. Michaels (State Bar No. 298130)
  jmichaels@bgrfirm.com
Jason Y. Kelly (State Bar No. 274144)
  jkelly@bgrfirm.com
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

Attorneys for Plaintiff Ashly Esquivel
and all others similarly situated

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ASHLY ESQUIVEL, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ALPHABET INC. and GOOGLE LLC,<br><br>Defendants. | Case No. 2:20-cv-10549<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF:**<br><br>**1. CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*);**<br><br>**2. MONOPOLIZATION UNDER THE SHERMAN ACT (15 U.S.C. § 2); and**<br><br>**3. ATTEMPTED MONOPOLIZATION UNDER THE SHERMAN ACT (15 U.S.C. § 2)**<br><br>**DEMAND FOR JURY TRIAL** |

# I.  __INTRODUCTION__

1.    Google is one of the largest and richest corporations in the world.  Its domination has been expressed in a variety of markets and is the subject of substantial antitrust litigation. In October 2020, the U.S. Department of Justice and the Attorneys General of eleven states initiated an action to restrain Google "from unlawfully maintaining monopolies in the markets for general search services, search advertising, and general search text advertising in the United States through anticompetitive and exclusionary practices." *United States of America v. Google LLC*, No. 1:20-cv-3010, Dkt. No. 1 (D.D.C. Oct. 20, 2020). And months earlier, Epic Games, Inc. filed suit under the Sherman Act to "end Google's unlawful monopolization and anti-competitive restraints." *Epic Games, Inc. v. Google LLC*, No. 3:20-cv-5671, Dkt. No. 1 (N.D. Cal. Aug. 13, 2020).

2.    Android operates in one of the various markets that Google dominates. Indeed, after acquiring Android in July 2005, Google declared that "Android is poised for world domination." Google was right. Today, Android is a dominant mobile operating system, running on approximately 75% of the world's mobile devices. In the United States, Android captures about 47% of the U.S. mobile operating system market. The only alternative to Android in the United States is Apple's iOS, which captures the remaining 52% of the U.S. mobile operating system market.

3.    Google Play (the application store formerly known as the Android Market) is available to electronic device users running Google's Android operating system ("OS"). While Google claims that the Android OS is maintained as "open" source software, Google has engaged in a course of conduct designed to deter competition in the market for Android applications or "apps" and products sold with such apps (the "Google Play Market").

4.    Plaintiff Ashly Esquivel ("Plaintiff"), on behalf of herself and all others similarly situated (the "Class," as defined below), brings this class action for

1   damages and other relief pursuant to federal antitrust and California unfair

2   competition and consumer protection laws. Plaintiff and the putative Class have

3   overpaid or otherwise suffered economic losses due to Google's monopolization of

4   the Google Play Market and therefore sue for damages and other relief.

5         5.     Plaintiff demands a trial by jury.

6  **II.**    **PARTIES**

7      **A.**    **Plaintiff**

8         6.     Plaintiff Ashly Esquivel ("Plaintiff") is an individual, resides in

9   Inglewood, California, and purchased and paid Google for one or more apps through

10  Google Play.

11      **B.**    **Defendants**

12        7.     Alphabet Inc. is a Delaware corporation with its principal place of

13  business in Mountain View, California. Google LLC is a wholly owned subsidiary

14  of Alphabet Inc.

15        8.     Google LLC is a Delaware limited liability company with its principal

16  place of business in Mountain View, California. Google LLC is a technology

17  company providing a search engine and other internet-related products, including

18  online advertising.

19        9.     Alphabet Inc. and Google LLC are collectively referred to herein as

20  "Google" or "Defendants."

21  **III.**   **JURISDICTION AND VENUE**

22        10.    Plaintiff brings this action under Sections 4, 12, and 16 of the Clayton

23  Act (15 U.S.C. §§ 15, 22, 26) for treble damages, other relief, and reasonable

24  attorneys' fees and costs with respect to the injuries sustained by Plaintiff arising

25  from Defendants' violations of the federal antitrust laws, including Section 2 of the

26  Sherman Antitrust Act (15 U.S.C. § 2).

27        11.    This Court has jurisdiction over this action pursuant to Sections 1331,

28  1337(a), and 1367 of Title 28 of the United States Code (28 U.S.C. §§ 1331, 1337(a)

1367).

12.     This Court has *in personam* jurisdiction over Defendants because each, directly and/or through its ownership or control of subsidiaries: (a) transacted business in the United States, including in this District; (b) are registered to do business in the state of California; (c) had substantial aggregate contacts with the United States, including this District; and/or (d) engaged in anticompetitive acts that were directed at, and had a direct, substantial, and reasonably foreseeable and intended effect of injuring, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

13.     Venue is proper in this District pursuant to Sections 15 and 22 of Title 15 of the United States Code (15 U.S.C. §§ 15, 22) and Sections 1391(b) and (c) of Title 28 of the United States Code (28 U.S.C. § 1391(b), (c)), despite the Google LLC's Terms of Service suggesting that the courts in Santa Clara County, California are the proper venue in which to bring suit against Google LLC, because a substantial part of the events giving rise to Plaintiff's claims against Google LLC and Alphabet, Inc. occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants reside in this District or is licensed to do business in this District. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal restraint of trade throughout this District. The anticompetitive conduct alleged herein has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

## IV.  **FACTUAL ALLEGATIONS**

### A.    **Background Regarding Google**

14.     In 1998, Google launched as a general online search engine that served

users web results in response to online queries. Google's key innovation was its PageRank algorithm, which ranked the relevance of a webpage by assessing how many other webpages linked to it. PageRank enabled Google to improve the quality of its search results even as the web rapidly grew, in contrast with the technology used by rival search engines. While Google had entered a crowded field, it had become the world's largest search engine by 2000. Later that year, Google launched AdWords, an online advertising service that let businesses purchase keyword advertising to appear on Google's search results page—an offering that would evolve to become the heart of Google's business model.

15.     Google is now one of the world's major corporations. For 2019, Google reported total revenues of $160.7 billion—up 45% from 2017—and more than $33 billion in net income. Google has enjoyed strong and stable profits, with profit margins greater than 20% for nine out of the last ten years, close to three times greater than the average for a U.S. firm. Financial analysts predict that Google is well positioned to maintain its control, noting that "Alphabet has established unusually deep competitive moats around its business."

16.     Google is ubiquitous across the digital economy, serving as the infrastructure for core products and services online. It has grown and maintained its search engine power, such that go "Google" something is now synonymous with online searching. Google is now also the largest provider of digital advertising, a leading web browser, a dominant OS, and a major provider of digital mapping, cloud computing, email, and voice assistant services, alongside dozens of other offerings. Nine of Google's products—Android, Chrome, Gmail, Google Search, Google Photos, Google Drive, Google Play, Google Maps, and YouTube—have more than a billion users *each.* Each of these goods and services provides Google with a trove of user data, reinforcing its control across markets and driving greater monetization through online ads.

**B.      The Google Play Market**

17.      In the late 1990s and early 2000s, when Google was formed, internet searches were almost solely performed through browsers on computers. But, over the past two decades, individuals increasingly used non-desktop devices, such as phones and other electronic devices, to access the internet. Thus, Google launched a business policy to target users of electronic devices and to ensure their products implement versions of Google's technology, products, and OS.

18.      An app is software designed for use on a mobile or tablet device to provide access to digital content or services. Popular apps allow users to share content or play games and, importantly, permit "in app" sale or purchase transactions for goods and services. Apps can be pre-installed on an electronic device as a component of the OS by the Original Equipment Manufacturer ("OEM"). They can also be loaded directly onto the electronic device from the web using a web browser (a process that Google refers to as "sideloading"). The most frequent way that consumers access apps is through an app store, which itself may be pre-installed on the electronic device. Google uses Google Play to control the app market for devices using the Android OS. Google Play is a digital distribution service operated and developed by Google.

19.      An app store is the central point for users to access apps. It centralizes and curates the distribution of apps in a convenient manner for users.  It also allows users to search, review, and buy an app in one spot.

20.      There is a separate market for apps specific to the OS, including apps developed for Apple iOS which only work on Apple electronic devices, and apps developed for Android OS which only work on Android electronic devices. For the same reason, Apple's App Store and Google Play do not compete against one another.

21.      Google acquired Android in July 2005 for an estimated $50 million. Google describes Android as "a free, open-source mobile operating system"

available to anyone to download and modify on a royalty-free basis. Indeed, Android is unique in that Google does not generally monetize its operating system by selling proprietary hardware or demanding licensing fees. In practice, smartphone manufacturers that seek to use Android must sign Google's licensing agreements, however, as Google limits the functionality of non-licensed usage. Only through Google's licensing agreements can smartphone manufacturers access Google's proprietary apps, such as Gmail, YouTube, Chrome, Google Maps, and Google Play Store. In return, Google requires that certain apps must be pre-installed and must receive prominent placement on mobile devices. Device manufacturers must also enter into an agreement that prevents them from customizing Android and from building an Android "fork" that would make the version of Android running on a device incompatible with apps built for the Android ecosystem.

22. Google released the Android OS to acquire and gain control. Google released the Android code for free as "open source," which means that anyone could access the code and modify it. Modifying the OS constitutes a "fork."

23. The open source aspect of the Android OS was key to its wide adoption by OEMs (such as LG, Motorola, Samsung, etc.) and phone carriers (such as AT&T, T-Mobile/Spring, Verizon, etc.). Google's supposed lack of control over an open source OS led skeptical OEMs and phone carriers to use Android instead of other choices that were available then. The open source model suggested that the distributors, and not Google, would ultimately hold control over their devices and the app ecosystem on those devices.

24. However, once the distributors agreed to use Android OS, app developers looking for wide distribution of their apps were then incentivized by Google to develop apps compatible with Android OS. As more apps became available on Android OS, the OS became more eye-catching to consumers, which in turn led to even more developers designing for Android.

25. To achieve desired network effects and make the Android system

CLASS ACTION COMPLAINT

ubiquitous, Google then "shared" its search advertising and app store revenues with distributers to further induce distributors to give up control over the OS and what apps come preinstalled on electronic devices.

26.     Google solidified market control of Android OS through a series of contracts with distributors designed to diminish competition. Google requires OEMs such as LG, Motorola, and Samsung to enter "anti-forking agreements." These agreements specifically prohibit OEMs from developing or distributing versions of Android that do not comply with onerous Google-controlled technical standards. The signatories may not distribute devices with Android forks, or use their powerful brands to market forks on behalf of third parties. As a result of Google's anticompetitive practices, Android OS represents over 95% of licensable OS for smartphones and tablets in the United States.

27.     With control over the dominant Android OS, Google exercised its monopoly power to establish Google Play as the dominant "store" by which other applications can be downloaded for use by consumers on the Android ecosystem.

28.     Google required that electronic device OEMs pre-install Google Play on all electronic devices, knowing that users infrequently change defaults. Google also refuses to allow any rival app store to be downloaded from Google Play. Indeed, third-party app stores could only be accessed by "sideloading," a complicated multi-step process where users are warned that sideloading is unsafe. Thus, while Google theoretically permits sideloading third-party app stores, few users pursue this option because Google implements significant frictions designed to navigate consumers away from sideloading. Google goes out of its way to make side-loading difficult. Epic's recent lawsuit against Google (*Epic Games, Inc. v. Google LLC*, No. 3:20-cv-5671 (N.D. Cal.)) alleges:

> Google ensures that the Android process is technically complex, confusing and threatening, filled with dire warnings that scare most consumers into abandoning the lengthy process. For example, depending on the version of Android running on a mobile device, downloading and installing Fortnite on an Android device could take as

many as 16 steps or more, including requiring the user to make changes to the device's default settings and manually granting various permissions while being warned that doing so is dangerous.

29.     Additionally, Epic's complaint notes that when it attempted to work with LG, another Android device manufacturer, LG told Epic that it had a contract with Google "to block side downloading off Google Play Store this year." If a user is able to install the competing app store, Google blocks them "from offering basic functions, such as automatic updating of apps in the background, which is available for apps downloaded from the Google Play Store."

30.     Google also limits basic app functions that are available to apps downloaded on Google Play, including making it more challenging for users to update apps (versus automatic updates in the electronic device's background).

31.     Because Google Play is the primary way users install applications on Android devices, it effectively functions as a gatekeeper for software distribution on all devices with Android OS.

32.     As a result of its monopolistic conduct, Google has extracted supra-competitive prices for its Android app distribution services and in-app purchases made through Google Play, including a 30% commission on sales of paid apps and a 30% fee for in-app purchases. Google collects and processes these commissions and fees directly from Plaintiff and Class Members, remitting the remainder of their payment to the app developer.

33.     Google uses its gatekeeping power over third-party app developers through arbitrary and unaccountable enforcement of Google Play policies, which then protect the power of Google's own services and stifles competitors. One app "Callsome" was banned from Google Play for "Ad Policy" violations, for example, only to learn later that a similar product was able to stay and thrive in Google Play. Callsome believes it was banned because of its partnership with SmartApp, which at the time was widely considered to be a nascent but rising rival to Google in the Russian market.

34.     Google has used Android to entrench and extend its control in a variety of ways that undermine competition. These include: (1) using contractual restrictions and exclusivity provisions to extend Google's search monopoly from desktop to mobile and to favor its own applications; and (2) devising Android Lockbox, a covert effort to track real-time data on the usage and engagement of third-party apps, some of which were Google's competitors. Additionally, Google's Play Store now functions as a gatekeeper, which Google is increasingly using to hike fees and favor its own apps. Overall, Android's business practices reveal how Google has maintained its search dominance through relying on various contractual restrictions that blocked competition and through exploiting information asymmetries, rather than by competing on the merits.

## V.     GOOGLE'S MONOPOLY IN THE GOOGLE PLAY MARKET

35.     The Play Store is the dominant app store on Android devices. Google chose a single app store to control software distribution on the Android ecosystem, with one executive noting that "we would strongly prefer to have one Market that everyone focuses on."

36.     Because Google's Play Store is the primary way that users install applications on Android devices, the Play Store effectively functions as a gatekeeper for software distribution on a majority of the world's mobile devices. For example, Google uses its Play Store gatekeeper power to charge high fees to mobile developers. Amazon, Spotify, Netflix, Epic Games, and Tinder have all expressed public concerns about Google's app store fees, along with Apple. As a lawsuit recently filed by Epic Games stated, "Google has thus installed itself as an unavoidable middleman for app developers who wish to reach Android users and vice versa. Google uses this monopoly power to impose a tax that siphons monopoly profits for itself every time an app developer transacts with a consumer for the sale of an app or in-app digital content."

37.     Although Google does not block off all alternative channels for

1   accessing apps allowing, for example, both some app stores and side-loading in

2   practice, these options do not provide meaningful alternatives to the Google Play

3   Store. In contrast the dual dominance of the Play Store and the Android ecosystem

4   enable Google to exert control and engage in conduct that harms competition by

5   exploiting, excluding, and discriminating against rivals.

6         38.    The Play Store's control over app distribution on Android devices has

7   enabled Google to begin to require use of its in-app payment system (IAP). As a

8   result, Google has become the middleman between app developers and their

9   customers. This was not always the case. Google has changed its stance and re-

10   interpreted policies over time to require more app developers to use Google Pay.

11   Beginning in 2014, for example, Google designated specific categories of

12   applications—including mobile games—that would be required to use Google Play

13   In-App Billing. Recently, Google has begun insisting that a broader category of apps

14   will be required to use Google IAP exclusively, no longer allowing the option of a

15   third-party payment processor.

16         39.    Google maintains a monopoly in the Google Play Market and is able to

17   charge supra-competitive prices for apps and in-app purchases. Google uses

18   anticompetitive covenants in Google's Mobile Application Distribution Agreement

19   ("MADA"), requiring OEMs to license the entire suite of Google applications and

20   services to also license the Android OS. Google also requires OEMS to pre-install

21   Google Play on its home page. If OEM refuse these restrictive terms and conditions,

22   they lose access to the Android OS.

23         40.    As a result of the MADA terms and conditions, Google has

24   successfully prevented competition from its competitors in the Google Play Market.

25   Google's MADA agreements also allow Google to charge supra-competitive prices

26   for apps and in-app purchases, harming Plaintiff and Class Members by limiting

27   consumer choice.

28         41.    Similarly, Google uses its Developer Distribution Agreement ("DDA")

1  to contractually restrict competition in the Google Play Market. Amongst other

2  terms, the DDA mandated that developers comply with Google's Developer

3  Program Policies, including using Google's proprietary in-app billing for in-app

4  game payments, as well as certain other digital in-app purchases. The DDA also

5  requires that developers "may not use Google Play to distribute or make available

6  any Product that has a purpose that facilitates the distribution of software

7  applications and games for use on Android devices outside of Google Play." Google

8  has the power to eliminate any Android app it believes has violated any portion of

9  the DDA.

10      42.    Google's anticompetitive agreements with other companies are not

11  limited to Google Play or Android. Google has also engaged in illegal tactics to

12  protect its other monopolies, including in web search. For example, Google and

13  Apple have a long-standing agreement whereby Apple agreed to make Google the

14  default search engine on Apple products:

> When Tim Cook and Sundar Pichai, the chief executives of Apple and
> Google, were photographed eating dinner together in 2017 at an
> upscale Vietnamese restaurant called Tamarine, the picture set off a
> tabloid-worthy frenzy about the relationship between the two most
> powerful companies in Silicon Valley.
>
> As the two men sipped red wine at a window table inside the restaurant
> in Palo Alto, their companies were in tense negotiations to renew one
> of the most lucrative business deals in history: an agreement to feature
> Google's search engine as the preselected choice on Apple's iPhone and
> other devices. The updated deal was worth billions of dollars to both
> companies and cemented their status at the top of the tech industry's
> pecking order. . . .
>
> [T]he pact, which was first inked 15 years ago and has rarely been
> discussed by either company, has highlighted the special relationship
> between Silicon Valley's two most valuable companies    an unlikely
> union of rivals that regulators say is unfairly preventing smaller
> companies from flourishing. . . .
>
> Nearly half of Google's search traffic now comes from Apple devices . .
> . and the prospect of losing the Apple deal has been described as a
> "code red" scenario inside [Google].
>
> Apple now receives an estimated $8 billion to $12 billion in annual
> payments up from $1 billion a year in 2014 in exchange for building
> Google's search engine into its products. It is probably the single

biggest payment that Google makes to anyone and accounts for 14 to 21 percent of Apple's annual profits. That's not money Apple would be eager to walk away from.

Daisuke Wakabayashi and Jack Nicas, "*Apple, Google and a Deal That Controls the Internet,*" N.Y. Times (Oct. 25, 2020)

43.  Google therefore uses anticompetitive agreements with various companies to acquire and maintain its various monopolies in various markets.

## VI.  RELEVANT MARKET

44.  For purposes of this action, the relevant product market is the market for apps and in-app purchases on mobile devices compatible with the Android OS. For purposes of this action, the relevant geographic market is the United States and its territories. Google has substantial and long-lasting power in this market, app stores and apps are developed and distributed throughout the United States, and Google Play is available to Android users throughout the United States.

## VII.  ANTITRUST INJURY

45.  Plaintiff and Class Members purchased Android apps and in-app digital content directly from Google through Google Play. Without the unlawful restraints described above, Plaintiff and Class Members would not have to pay supra-competitive price for apps and in-app purchases. Google's anticompetitive practices also stalled, limited or foreclosed competition and innovation in the Google Play Market.

## VIII.  STATUTE OF LIMITATIONS TOLLING

46.  Plaintiff and Class Members had no knowledge of Google's anticompetitive conduct, or of facts sufficient to place them on inquiry notice of the claims asserted herein, during the Class Period and continuing thereafter, until October 2020 when the United States House of Representatives published its Investigation of Competition in Digital Markets and provided details concerning Google and its conduct.

47.  Plaintiff and Class Members suffered economic loss due to Google's

wrongful exercise of monopoly power. Plaintiff's interactions with Google were insufficient, however, to discover Google's wrongful conduct.

48.     Furthermore, no public information was available during the Class Period or thereafter that suggests Google's business activities were done to monopolize the Google Play Market until the House of Representatives published the Report of its investigation against Google.

49.     Moreover, it was reasonable for Plaintiff and Class Members not to suspect that Defendants were engaging in any unlawful anticompetitive behavior. Plaintiff and Class Members are simply consumers of apps and were not active participants in the market.

50.     Plaintiff alleges a continuing course of unlawful conduct by Google, including conduct within the applicable limitation periods. That conduct has inflicted continuing and accumulating harms within the applicable statutes of limitation.

51.     For these reasons, the statutes of limitations applicable to Plaintiff's and Class Members' claims have been tolled with respect to the claims asserted herein until the House of Representatives' Report about Google became public.

52.     Additionally, or alternatively, application of the doctrine of fraudulent concealment tolled the statutes of limitations on Plaintiff's and the Class Members' claims. Plaintiff and Class members had no knowledge of Google's wrongful acquisition and maintenance of monopoly power in the relevant market, or of facts sufficient to place them on inquiry notice of their claims, during the Class Period and continuing thereafter. No information in the public domain or otherwise available to Plaintiff and Class Members during the Class Period suggested that Google had wrongfully acquired a monopoly or was using its monopoly power to charge supra-competitive prices.

53.     In failing to disclose its wrongful monopolization, in addition to denying it was engaged in such conduct, Google was able to conceal its illegal

conduct. In fact, Google has made public denials to this effect in the United States and to foreign regulators.

54.     After it was revealed that the House  of Representatives was investigating Google's monopoly, Google denied such conduct. Similarly, in response to recent news reports of impending antitrust actions against it by federal and state officials for monopolization, Google stated publicly that competition is flourishing and that publishers and marketers have enormous choices. This was simply incorrect.

55.     Further, Google's anticompetitive monopoly conduct was inherently self-concealing because, as Google knew, its disclosure likely would have led to governmental enforcement activity or civil liability. Google's conduct is subject to antitrust regulation, so it was reasonable for Plaintiff and Class Members to presume that they were purchasing apps in a competitive market. A reasonable person under the circumstances would not have had reason to suspect that apps were being sold at supra-competitive prices at any time during the Class Period.

IX.     **CLASS ACTION ALLEGATIONS**

56.     Plaintiff brings this action both on behalf of herself and as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on behalf of the following Class:

> From at least as early as January 1, 2016 through the present (the "Class Period"), all persons and entities in the United States that paid Google for an app on Google Play, subscription fees for an app obtained on Google Play, or app content from an app downloaded from Google Play.

57.     This class definition specifically excludes any of the Defendants named herein, any of the Defendants' parent companies, subsidiaries, and affiliates, and any of the Defendants' officers, directors, management, employees, subsidiaries, affiliates or agents. Plaintiff reserves the right to expand, modify, or alter the class definition in response to information learned during discovery.

58.     This action is properly brought as a class action under Federal Rule of

1  Civil Procedure 23(a) for the following reasons:

2      a.    **Adequacy of Representation (Fed. R. Civ. P. 23(a)(4)):** Plaintiff will

3          fairly and adequately protect the interests of the Class in that he has no

4          interests antagonistic to those of the other members of the Class, and

5          Plaintiff has retained attorneys experienced in antitrust class actions

6          and complex litigation as counsel;

7      b.    **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2) and**

8          **23(b)(3)):** There are questions of law and fact common to the proposed

9          Class which predominate over any questions that may affect particular

10          Class Members. Such common questions of law and fact include, but

11          are not limited to:

12        i.    Whether Google unlawfully acquired and maintained monopoly

13            power in the relevant market;

14        ii.    Whether Google unlawfully attempted to acquire and maintain

15            monopoly power in the relevant market;

16        iii.    Whether Google monopolized the market for Android apps at

17            any time during the Class Period;

18        iv.    Whether Google attempted to monopolize the market for

19            Android apps at any time during the Class Period;

20        v.    Whether Google engaged in unlawful or unfair competition;

21        vi.    Whether Plaintiff and the other Class Members were injured by

22            Defendants' conduct and, if so, the determination of the

23            appropriate Class-wide measure of damages;

24        vii.    Whether Defendants unjustly enriched themselves to the

25            detriment of the Plaintiff and the other Class Members, thereby

26            entitling Plaintiff and the other Class Members to disgorgement

27            of all benefits derived by Defendants;

28        viii.    Whether Plaintiff and the other Class Members are entitled to,

among other things, equitable relief, and, if so, the nature and extent of such relief;

ix.    Whether Plaintiff and the other Class Members had any reason to know or suspect Defendants were engaging in any unlawful anticompetitive behavior; and

x.    Whether Defendants fraudulently concealed their unlawful anticompetitive behavior from Plaintiff and the other Class Members.

c.    **Numerosity (Fed. R. Civ. P. 23(a)(1)):** The proposed Class is so numerous and geographically dispersed that the joinder of all Class Members is impracticable. While Plaintiff does not know the exact number and identity of all Class Members, Plaintiff is informed and believes that there are millions of Class Members. The precise number of Class Members can be ascertained through discovery;

d.    **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiff's claims are typical of the claims of the other Class Members. Plaintiff and the Class have been injured by the same wrongful practices of Defendants. Plaintiff's claims arise from the same practices and conduct that give rise to the claims of the Class and are based on the same legal theories;

59.    This action is properly brought as a class action under Federal Rule of Civil Procedure 23(b) for the following reasons:

a.    **Superiority (Fed. R. Civ. P. 23(b)(3)):** Certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

b.    **Declaratory and Injunctive Relief (Fed. R. Civ. P. 23(b)(2)):**

1               Certification under Rule 23(b)(2) is warranted because Defendants

2               acted or refused to act on grounds generally applicable to the Class,

3               thereby making appropriate final equitable, declaratory, or other

4               appropriate equitable relief with respect to the Class as a whole.

5     c.     The proposed Class is ascertainable and there is a well-defined

6               community of interest in the questions of law or fact alleged herein

7               since the rights of each proposed Class Member was infringed or

8               violated in the same fashion;

9     60.     A class action is superior to other available methods for the fair and

10 efficient adjudication of this controversy for at least the following reasons:

11     a.     Given the size of individual Class Member's claims and the expense of

12               litigating those claims, few, if any, Class Members could afford to or

13               would seek legal redress individually for the wrongs Defendants

14               committed against them and absent Class Members have no substantial

15               interest in individually controlling the prosecution of individual

16               actions;

17     b.     Without a class action, Class Members will suffer damages, and

18               Defendant's violations of law will proceed without remedy while

19               Defendants reaped and retained the substantial proceeds of their

20               wrongful conduct;

21     c.     This action will promote an orderly and expeditious administration and

22               adjudication of the proposed Class claims, economies of time, effort,

23               and resources will be fostered, and uniformity of decisions will be

24               ensured; and

25     d.     Plaintiff knows of no difficulty that will be encountered in the

26               management of this litigation which would preclude its maintenance as

27               a class action.

28

# X.   CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Violation of the California Unfair Competition Law

### (Cal. Business and Professions Code §§ 17200, *et seq.*)

61.   Plaintiff hereby repeats and incorporates by reference each preceding paragraph as if fully stated herein.

62.   Google's conduct is unlawful in violation of California's Unfair Competition Law ("UCL") because it violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

63.   Google has engaged in unfair business practices through the conduct alleged herein, which has restrained competition. Google's conduct is unfair and in violation of the UCL because it violates California's clearly established public policy forbidding monopolistic acts. Google wrongfully acquired and unlawfully maintained monopoly power in the relevant market through the conduct alleged herein, including by leveraging its monopoly power in the Google Play Market to coerce the purchase of Android apps and in-app products and services at artificial prices.

64.   Google's practices also are unlawful in violation of the UCL because they offend public policy; are immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm, including in the form of artificially inflated prices, that greatly outweigh any possible utility from the practices.

65.   Google's conduct actually and proximately caused Plaintiff and Class Members to lose money or property. On behalf of the Class, Plaintiff seeks damages, other relief, and reasonable attorneys' fees and costs, as well as any other relief the Court may deem just or proper.

## SECOND CAUSE OF ACTION

### Monopolization Under the Sherman Act

### (15 U.S.C. § 2)

66.     Plaintiff hereby repeats and incorporates by reference each preceding paragraph as if fully stated herein.

67.     Plaintiff brings this claim on her own behalf and on behalf of each member of the Class described above.

68.     The relevant market is the U.S. market for apps and in-app purchases sold in the Google Play Market.

69.     Google has gained and maintains monopoly power in the relevant market by improper and unlawful means. More specifically, Google has willfully acquired and maintained such power by coercing the purchase of Android apps and in-app products and services at artificial prices and by its patently exclusionary conduct, including its refusal to allow rival app stores to be accessed through Google Play and implementing significant frictions designed to steer consumers away from sideloading third-party app stores. Consumers must use the Google Play Market to obtain Android apps and in-app purchases.

70.     For the reasons stated herein, substantial barriers to entry exist in the relevant market.

71.     Google has the power to exclude competition in the relevant market, and it has used that power, including by way of its unlawful practices in restraint of trade as described herein, to maintain and expand its monopoly power in that market.

72.     Google's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rival app stores in the U.S. market for Android apps and in-app purchases.

73.     Google has behaved as alleged herein in an attempt to obtain a monopoly in the U.S. market for Android apps and in-app purchases, with the effect

being that competition is foreclosed, innovation is stifled, and consumer choice is gravely diminished. Additionally, Google has abused its market power by charging supra-competitive 30% commission on sales of paid apps and a 30% fee for in-app purchases. Further, Google's actions have depressed output and stifled innovation and options for consumers as alleged herein.

74.     There is no business necessity or other pro-competitive justification for Google's conduct.

75.     As a direct and proximate cause of Google's conduct, Plaintiff and members of the Class have suffered antitrust injury. Plaintiff and the Class Members paid significantly higher prices for Android apps and in-app purchases than they would have but for Google's unlawful conduct. That conduct also deprived Plaintiff and Class Members of improved quality and innovation in the relevant markets.

76.     Plaintiff is inclined to continue to purchase Android apps and in-app purchases in the future because of her investment in the electronic device containing the Android OS.

77.     Plaintiff and Class Members are entitled to damages, including treble damages, sustained because of Google's monopolistic acts and practices.

78.     Plaintiff and Class Members are entitled to equitable relief as appropriate to remedy Google's monopolistic conduct and restore competition in the relevant market. Members of the Class are regular users of the Google Play Market and will continue to purchase such apps and in-app products and services and suffer further injury if Google's monopoly is not terminated.

79.     Plaintiff and the Class also are entitled to equitable relief to prevent Google from persisting in its unlawful, inequitable, and unjustified behavior to their detriment, with such an injunction at a minimum prohibiting Google from continuing to charge a supra-competitive commission on sales of paid apps and a supra-competitive percent fee for in-app purchases. *See, e.g.,* 15 U.S.C. § 26.

## **THIRD CAUSE OF ACTION**

### **Attempted Monopolization Under the Sherman Act**

### **(15 U.S.C. § 2)**

80.  Plaintiff hereby repeats and incorporates by reference each preceding paragraph as if fully stated herein.

81.  Plaintiff brings this claim on her own behalf and on behalf of each member of the Class described above.

82.  The relevant market is the U.S. market for apps and in-app purchases sold in the Google Play Market.

83.  Google has attempted to monopolize the U.S. market for Android apps. More specifically, Google has willfully acquired and maintained market power by its patently exclusionary conduct, including its refusal to allow rival app stores to be accessed through Google Play and implementing significant frictions designed to steer consumers away from side loading third-party app stores. Consumers must use the Google Play Market to obtain Android apps and in-app purchases.

84.  Google's anticompetitive conduct has created a dangerous likelihood that it will attain monopoly power in the U.S. market for Android apps and in-app purchases.

85.  Google has a specific intent to attain monopoly power in the U.S. market for Android apps and in-app purchases. Now, and if its unlawful restraints are not checked, Google has a dangerous likelihood of success in the relevant market as defined by Plaintiff.

86.  Google has the power to exclude competition in the U.S. market for Android apps and in-app purchases, and it has used that power, including by way of its unlawful practices in restraint of trade as described herein, in an attempt to monopolize that relevant market.

87.  Google's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rival app stores in the U.S. market

for Android apps and in-app purchases.

88.     Google has behaved as alleged herein in an attempt to obtain a monopoly in the U.S. market for Android apps and in-app purchases, with the effect being that competition is foreclosed, innovation is stifled, and consumer choice is gravely diminished. Additionally, Google has abused its market power by charging a supra-competitive 30% commission on sales of paid apps and a 30% fee for in-app purchases. Further, Google's actions have depressed output and stifled innovation and options for consumers as alleged herein.

89.     There is no business necessity or other pro-competitive justification for Google's conduct.

90.     Plaintiff and the Class have been injured, and will continue to be injured, in their property as a result of Google's conduct, including by way of overpaying for Android apps and in-app purchases.

91.     Plaintiff is inclined to continue to purchase Android apps and in-app purchases in the future because of her investment in the electronic device containing the Android OS.

92.     Plaintiff and the Class also are entitled to equitable relief to prevent Google from continuing in its unlawful, inequitable, and unjustified behavior to their detriment, with such an injunction at a minimum prohibiting Google from continuing to charge a supra-competitive commission on sales of paid apps and a supra-competitive percent fee for in-app purchases. *See, e.g.,* 15 U.S.C. § 26.

## XI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment on her behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

1.     That the Court determine that this action may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(2), (b)(3), and (c)(4), that Plaintiff be certified as Class representative, and Plaintiff's counsel be appointed as counsel for the Class;

2.     That the unlawful conduct, practices, and policies alleged herein be adjudged and decreed to be unfair and unlawful business practices and policies in violation of the UCL, as well as monopolistic acts and practices in violation of Section 2 of the Sherman Act;

3.     That Defendants have violated the UCL by engaging in conduct that constitutes unlawful, unfair, and fraudulent business practices;

4.     That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining their unlawful conduct, practices, and policies alleged herein;

5.     That Plaintiff and the Class are entitled to equitable relief appropriate to remedy Defendants' past and ongoing restraint of trade, including:

     i.     A judicial determination declaring the rights of Plaintiff and the Class, and the corresponding responsibilities of Defendants; and

     ii.     Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the Respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from violations of the law as alleged herein.

6.     That Plaintiff and the Class have been injured in their business and property as a result of Defendants' violations;

7.     That Plaintiff and the Class recover damages, as provided by law, determined to have been sustained as to each of them, in an amount to be trebled in accordance with the antitrust laws, and that judgment be entered against Defendants on behalf of Plaintiff and the Class;

8.     Plaintiff and the Class recover their costs of suit, including reasonable attorneys' fees, costs, and expenses of the lawsuit, as provided by law;

9.     That Plaintiff and the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

10.     That Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program to give immediate notification to the Class; and

11.     For such other and further relief as is just under the circumstances.

## XII.   **DEMAND FOR JURY TRIAL**

Plaintiff and the Class demand a trial by jury of all the claims asserted in this complaint that are so triable pursuant to Federal Rule of Civil Procedure 38(b).

DATED:  November 18, 2020          BROWNE GEORGE ROSS
                                   O'BRIEN ANNAGUEY & ELLIS LLP
                                        Eric M. George
                                        Maribeth Annaguey
                                        Carl Alan Roth
                                        James L. Michaels
                                        Jason Y. Kelly


                                   By:  _____/s/ Eric M. George_____
                                            Eric M. George
                                   Attorneys for Plaintiff Ashly Esquivel and all others similarly situated